In the Matter of the ESTATE of Elizabeth TYLER, Deceased.

Paul R. TYLER and Alan Tyler, Appellants,

v.

O. D. TYLER, Jr., et al., Appellees.

No. 55422.

Supreme Court of Iowa.

April 25, 1973.

Dickinson, Throckmorton, Parker, Mannheimer & Raife, Harry T. Watts, and Paul R. Tyler, Des Moines, for appellants.

Russell Jordan, and Ralph L. Powers, Des Moines, for appellees.

Heard by MOORE, C. J., and RAWLINGS, REES, REYNOLDSON and HARRIS, JJ.

REES, Justice.

Elizabeth Tyler died on December 13, 1971, intestate, at the age of 61 years, a patient at the State Hospital at Woodward. She had been mentally and physically incompetent all of her life, and had been a patient at the Woodward hospital for many years prior to her death. She had been under guardianship since 1943. At the date of her death her guardian was a brother, O. D. Tyler, Jr., who had been appointed to succeed a prior guardian in 1946.

Decedent was survived by two sisters, Geneva Tyler Drumm and Helen Tyler George, both residents of California, a brother, O. D. Tyler, Jr., and by two nephews, sons of a deceased brother, Victor Hugh Tyler, namely: Paul R. and Alan Tyler. Paul R. Tyler is an attorney, and Alan Tyler is a physician; both reside in Des Moines. O. D. Tyler, Jr. is a pharmacist at Lennox, and has been engaged in the drug business for many years.

On December 14, prior to the burial and funeral of decedent, Paul R. Tyler filed in the office of the Clerk of Taylor County a petition for administration on decedent's estate, asking for his appointment as administrator, and on the same date he was appointed, posted a corporate surety bond in the penal sum of $35,000, and letters of administration were issued to him. This appointment was made by the Clerk under the provisions of section 633.22, The Code, 1966.

On December 15 O. D. Tyler, Jr., Helen Tyler George and Geneva Tyler Drumm filed their motion to review the appointment of the administrator by the Clerk, said motion being in accordance with the provisions of section 633.23, The Code. A resistance to the motion was filed by Paul and Alan Tyler, and on February 4, 1972 hearing was had on the motion and resistance. On February 17 the court filed its ruling setting aside the appointment of Paul Tyler and appointing O. D. Tyler, Jr., as administrator of the estate of Elizabeth Tyler, and fixing his bond in the sum of $35,000. From this order and ruling, appeal is taken by Paul R. and Alan Tyler.

The petition for the review of the Clerk's action in appointing Paul Tyler as administrator raised no question as to his capability or qualifications to serve as administrator of decedent's estate. The petitioners therein alleged that the appointment of Paul Tyler was made on his own petition and without consultation with the other heirs of the decedent, and at a time prior to the burial services for the decedent; that the petitioners are the only surviving sisters and brother of the decedent; that O. D. Tyler, Jr. was then and had been for more than 25 years the duly appointed and acting guardian of the decedent as shown by the records and files in the guardianship proceedings; that as such guardian the said O. D. Tyler had had all of the care of her business affairs and that it would be for the best interests of the estate if the said O. D. Tyler, Jr. was appointed as administrator. Trial court proceeded to hearing on the petition for review and correctly concluded that its review of the petition was *de novo* (Section 633.24, The Code), and did not treat the petition as an application to remove the administrator appointed by the Clerk, but proceeded as though no appointment had ever been made. Trial court relied on the pronouncements of this court in In Re Guardianship of Waite, 190 Iowa 182, 180 N.W. 159, and In re Guardianship of Carrick, 250 Iowa 1181, 98 N.W.2d 315.

The original assets of the guardianship estate consisted of about $2700 in cash, a mercantile building in Lennox which was later sold to the guardian for $4500, and a home later sold for $6050. During the pendency of the guardianship, the guardian also received from the estate of a relative for and on account of the ward, $11,644, making the total original assets $24,894. It appears that at the date of the death of decedent, the guardian had assets in his hands aggregating $40,792. During the 25 years O. D. Tyler, Jr. served as guardian he received as compensation only the sum of $1,000, which was paid in 1968 to defray his travel and other expenses incurred in making periodic visits to his ward at the Woodward hospital.

Appellee-guardian in his brief contends he has, after the payment for the keep of the ward and the expenses of the guardianship, increased the gross holdings of the guardianship by about 70 percent. However, in appellant's reply brief it appears that since the hearing on the petition for the review of the Clerk's action in appointing Paul Tyler as administrator, Taylor County had filed a claim in the estate for the sum of $28,505.98 for unpaid charges for the care of the ward in the Woodward hospital beginning with the second quarter of the year 1960 and through the fourth quarter of 1971. In oral argument at the time this matter was presented, counsel for appellees conceded such claim had been filed. If we assume such claim is a proper charge against the estate of the decedent, it would reduce the estate to about $12,000.

The appellants rely for reversal on the proposition the trial court abused its discretion in setting aside the appointment made by the Clerk of Paul R. Tyler as administrator and in ordering the appointment of O. D. Tyler as administrator, and assert:

(1) The order of the trial court in appointing O. D. Tyler as administrator should be overturned where there has been an abuse of discretion.

(2) Under Iowa law, the beneficial interest in an estate is of no relevance in determining who shall be administrator of such estate.

(3) A guardian of the property of a decedent during the decedent's lifetime is given no priority for appointment as the administrator of the decedent's estate.

(4) In determining the suitability of an applicant for appointment as administrator of a decedent's estate his prior unlawful conduct as conservator of the decedent and the probability of his indebtedness to the decedent's estate should be weighed heavily against his appointment as administrator of the estate, and facts which would be grounds for removal of the fiduciary should preclude the appointment of the same party to the position of successor fiduciary handling the same assets.

I. Under the provisions of section 633.-227(2), The Code, 1966, where there is no will and no surviving spouse, administration shall be granted to any qualified person on the petition of "the heirs of the decedent". Prior to the enactment of the present Probate Code by the 60th General Assembly in 1963, section 633.39 of the 1962 Code and prior codes, which was supplanted by the present section 633.227, provided that administration should be granted where no spouse survived on the "request and application of: * * * (2) the next of kin".

The change of the language of section 633.39 of the 1962 Code which originally provided that administration should be granted on the petition of "the next of kin" to the provision in section 633.227 of the 1966 Code that administration should be granted on the petition of "the heirs of the decedent", really worked no meaningful distinction.

In In re Wright's Estate, 210 Iowa 25, 27, 230 N.W. 552, 553, this court said, quoting from In re Estate of Weaver, 140 Iowa 615, 119 N.W. 69, 70, 22 L.R.A.,N. S., 1161, 17 Ann.Cas. 947:

"If a decedent leave neither parent nor lineal descendants surviving him, then surviving brothers and sisters would be nearest in blood, and 'next of kin'. In its practical use in public statutes the term 'next of kin' has come to mean ordinarily those persons who take the personal estate of the deceased under the statutes of distribution."

Further, in *Wright*, 230 N.W. at page 553, this court said:

"It clearly appears that the appellant, sister, and the nieces and nephew are all included within the term 'next of kin'. It is the contention of the appellant that, because she is nearer in blood to the deceased than the nieces and nephew, therefore, in contemplation of sections 11883 and 11884, she is 'next of kin' and entitled to preference in the exercise of the right to apply for her appointment, or the appointment of her nominee, as administrator of the estate.

"On the other hand, it is the contention of the appellee that there are no degrees of 'nearness' in the class of 'next of kin'. It is apparent from a reading of section 11883 that all parties who are entitled to or could apply for appointment are divided into four classes, two of which precede creditors. The first class is confined entirely to the surviving spouse, the second class is confined entirely to 'next of kin', and the third class to creditors.

"By the terms of section 11884 it will be seen that each class in succession is given a period of twenty days, commencing with the date of the burial of the deceased, within which to apply for administration. The spouse has twenty days within which to act. All those who constitute the second class that is to say, the 'next of kin', are given the second period of twenty days. Can it be said that the Legislature intended any preference to any one or the other of the various parties who constitute the second class? If it be argued that the nearest of blood in

the second class should have the first right to apply for appointment, then the next question is for what length of time has this nearest in the blood—this *individual* of the second class—the exclusive right. The statute is silent.

"It is quite apparent that, if the Legislature intended that the nearest in blood of the class 'next of kin' should have preferential rights for a limited period of time within which to make application, a schedule of such exclusive periods of time would have been incorporated into the statute in the same manner as section 11884 fixes a schedule of time for each of the classes named in section 11883. It is easily conceivable that there might be in a given case several classes or groups within the class, the next of kin. The deceased might have left children, grandchildren, brothers and sisters, and nieces and nephews. It is apparent that the only way appellant's interpretation of the statute could be made practical would be to add to it by legislation, giving each group within the class a definite period within which said group would have the exclusive right to apply for administration. Furthermore, because the sister is nearer in blood than the niece, it does not follow she is hereby entitled, as against the application of the niece, to appointment. It is a matter properly within the sound discretion of the court to determine as between the applicants of a class."

■ Any consideration given by trial court to the fact that the relationship of O. D. Tyler to decedent was closer by virtue of kinship as a brother of decedent than were the nephews Paul and Alan Tyler, if such fact were given consideration by the court, and the fact O. D. Tyler and his two sisters would succeed to a three-fourths interest in any property of the estate for distribution, clearly was not a proper one.

II. It is the contention of appellants, trial court should have looked to the conduct of O. D. Tyler, Jr., as guardian of Elizabeth Tyler, and the management of the guardianship estate under his stewardship in determining his suitability as administrator of decedent's estate.

We have had certified to us the court file in the guardianship matter pending in the District Court of Taylor County. An examination of the file, which is voluminous, evidences the fact that the guardian has made loans to himself from time to time without first securing authority of court for the making of the same. Reference is made to the annual report filed January 10, 1959, which reflects a loan to O. D. Tyler of $12,000 made on November 5, 1958. The report for 1961 evidences a loan made on December 16, 1960 of $1000, also to O. D. Tyler, the guardian. The report for 1962 reflects a mortgage loan made August 8, 1962 for $1500, but does not identify the borrower. Another mortgage loan appears to have been made on April 26, as reflected by the 1962 report, for the sum of $1938, but the borrower is not identified. In the report for the year 1963, reference is made to the sum of $2100 "loaned on note" on February 14, 1963 without the identity of the borrower being shown. In the report for the year 1964, six loans are shown, having been made at various times throughout the year and for various amounts ranging from $2500 to $27,000. The identity of the borrower is not shown with respect to any of the loans reported in the 1964 report.

In the 1965 report a loan is shown as having been made to O. D. Tyler for the sum of $23,000, one to Phil Tyler for $400, and one to Dale Eklund for $6000. At the hearing on the petition to review the Clerk's appointment of administrator, Mr. Tyler, the guardian, testified with respect to the $6000 loan to Dale Eklund, and identified Mr. Eklund as the guardian's son-in-law. He further testified that as security for said loan Eklund had given to the guardian a chattel mortgage on an International truck or tractor worth $12,000.

In the report for the year 1966, three mortgage loans in the principal amounts of

$2500, $3000 and $2000, are shown with no identification of the borrowers.

A $12,000 mortgage loan is reported to have been made during 1967, with no identification of the borrower. In the 1968 report mortgage loans of $3500 and $2142 are shown to have been made without the borrowers being identified.

In 1970 a first mortgage loan in the amount of $10,500 is shown to have been made without any report as to the identity of the borrower.

In 1971 the guardian recites in his report the fact that his ward died on December 13, 1971, but that during the period covered by the report the guardian had made a mortgage loan for $1500 without the borrower being identified.

The annual reports filed from time to time by the guardian were submitted to the scrutiny of the court, and orders approving the same were entered.

The appellees contend the guardian did not act in any unlawful manner in the conduct of the guardianship affairs, and the evidence shows he has accounted for all of the funds in the guardianship estate with a reasonable rate of interest thereon. As to whether or not this contention has been controverted by the appellants we are not prepared to say from our examination of the court file which admittedly must be superficial at best, as independent inquiry would have to be made to determine whether or not the contentions made by the guardian and other appellees are true.

At the hearing on the petition for review of the Clerk's appointment, the guardian testified the only time he ever used money from the guardianship estate was during the process of making transfers from one loan to another. He testified he did not know how many times, but it was always done and done exactly, and that the interest was paid on it at each time. He testified he did not use the money in his own business as he did not need it, but that the loans had always been made on an invest-

ment basis, and justified the loans being made to himself rather than directly to the borrower by saying that the individual borrowers were not good credit risks, and that he was personally guaranteeing the repayment of the loans to the guardianship estate by making the loans in such manner.

The appellees further attempt to justify the handling of the guardianship funds as above recited by contending that the loans were made in conformity with the Model Prudent Man Investment Act, section 633.-123, The Code. We note, however, that many of the transactions antedated the enactment of the Model Prudent Man Investment Act, which was not enacted until 1965 by the 61st General Assembly.

This appeal is obviously the culmination of an intrafamilial controversy. The dedication of O. D. Tyler to his handicapped sister over the period of many years in which he acted as her personal representative and guardian is indeed commendable. He has acted as guardian without substantial compensation, it appearing that he was paid only $1000 during the years he acted as guardian, and obviously had assumed considerable responsibility with respect to looking after the ward's property as well as concerning himself with her creature comforts and making repeated visits to her at the institution in which she was a patient.

We cannot escape, however, the obvious conclusion that the guardian, O. D. Tyler, engaged in self dealing with his ward's property, and that such a course of self dealing cannot be either sanctioned or condoned.

This court spoke very pointedly to this identical question in McIntire v. Bailey, 133 Iowa 418, 422, 110 N.W. 588, 590, where it said:

"In the absence of statute it is the duty of a guardian to keep his ward's money and property separate from his own; to keep an account thereof; to make investment, *not in his own name,*

but as guardian; and to keep those investments separate from his own. These duties are so well understood that we need not cite authorities, in their support. (emphasis supplied)

"It is conceded and the district court found that the guardian and did not make the reports required by law; that he did not have authority from the court to make any loans of his ward's funds; that he mixed these funds with his own and with those belonging to others, and made all loans and investments in his own name. But it is argued, and the district court so found, that, as it was not the practice in Washington county for guardians to receive authority of the court to make loans and investments, and as the guardian was acting in good faith, he should not be removed, as his bond was sufficient to make good all losses to the ward's estate. If there be such practice as that stated in the courts of Washington county, it is high time that such practice be discontinued, and there is no more effective method for doing so than to remove all court appointees who persist in following the practice. The statute is plain upon this subject, and should not be disregarded.

"The provision for making annual reports is, or should be, mandatory, although any reasonable explanation for failure to comply might be accepted, provided the delay was not unreasonable. In considering these matters it is not a question of motive or intent. The statute and rules referred to are for the protection of the ward, and the good intentions of the guardian are no excuse for his failure to observe them. In this case the guardian was not able to place his hand upon any particular investment and to say, 'This represents my ward's money.' He had so mingled the funds received from his ward's estate with others and with his own, and had so invested the entire amount, that he could not segregate the investments in any way. He kept no separate account of his ward's estate and handled all the money as if it were his own. This amounted to a conversion of the funds, and he and his bondsmen became liable for the entire amount received by him with interest. In such circumstances the guardian should be called to account, and removed, not only for the protection of his ward's estate, but of the sureties on his bond as well. It is not enough to say that his bond is good, and that the estate has not yet suffered. It is the duty of the court to call its officers to account, and, when it has knowledge of maladministration, to protect the sureties on the bond given by the guardian. If with full knowledge of the situation it continues the guardianship, it might well be claimed that the sureties were thereafter released. Ordinarily the matter of the removal of a guardian rests in the sound discretion of the court appointing him, but this is a legal discretion which it is the duty of appellate tribunals to correct where there has been an abuse thereof.

"We see nothing to indicate that the guardian has acted with bad motives or dishonest intent. His lapses have been due perhaps to want or knowledge of his duties, or to a custom, prevailing in his county, or to forgetfulness, but, whatever the source, it is manifest that such procedure almost always leads to disaster and loss. It may not have done so here, but the law is not made for particular instances. The statutes and rules of law prescribe a course which all must follow. This practice has been adopted after long experience for the protection of estates, and it must be followed. At the time of the hearing the guardian was unable to state just where the money of his ward was invested, and he presented no securities which he claimed belonged to his ward, and in his report named none. The effect of the whole matter is that the guardian has either loaned to himself without authority of court all of his ward's money, or had converted the entire amount to his own use."

As in *McIntire, supra,* we see nothing in the record before us to indicate the guardian Tyler has acted in this case with bad motives or dishonest intent. As we have observed *supra,* his dedication to his invalid sister is commendable. Nonetheless, we are forced to the conclusion that in his capacity as guardian he must be strictly accountable to the decedent estate, and that he should not be permitted to act as administrator thereof.

No reason appearing why Paul Tyler is not an acceptable and qualified person to act as administrator of the estate of Elizabeth Tyler, we now hold the action of the district court in removing him and appointing O. D. Tyler as administrator of the estate of Elizabeth Tyler must be, and is, hereby reversed. The appointment of Paul R. Tyler as administrator by the Clerk of the District Court is confirmed and ratified under our *de novo* review of the record.

We therefore reverse the trial court.

Reversed.